STATE OF IOWA, Appellee, v. WILBUR JOHN, Appellant.

RAPE: Opportunity and Complaints as Corroboration. Opportunity
1  to commit rape, and complaints by prosecutrix that the accused
had committed such án act on her, will not constitute the re-
quired corroboration.

RAPE: Complaints Not Constituting Res Gestae. Complaints by
2  prosecutrix as to the alleged assault upon her, made at a time
after she had had time to premeditate and deliberate, and after
she had premeditated and deliberated, are not admissible.

RAPE: Physical Incapacity—Effect. Physical incapacity of de-
3  fendant to consummate or commit an act of sexual intercourse
is, while not a defense, relevant to the issue of intent.

*Appeal from Mahaska District Court.*—D. W. HAMILTON,
Judge.

FEBRUARY 17, 1920.

DEFENDANT was indicted on the charge of assault with
intent to commit rape, tried, and convicted of simple as-
sault. He appeals. Opinion states the facts.—*Reversed.*

*L. T. Shangle* and *J. H. Whitecotton,* for appellant.

*Maxwell A. O'Brien,* County Attorney, and *H. M. Hav-
ner,* Attorney General, for appellee.

GAYNOR, J.—The defendant is charged with assault
with intent to commit rape. The crime is alleged to have
been committed on or about the 14th day of March, 1918,
in Mahaska County, Iowa. It is charged that the defend-
ant unlawfully, willfully, and with force and violence, made
an assault on one Mary Hattery, with intent then and
there to have carnal knowledge of and sexual intercourse
with her against her will. The indictment was returned
on the 21st day of May, 1918.

Defendant entered a plea of not guilty. The cause was

tried to a jury. At the February, 1919, term of said court, a verdict was returned, finding the defendant guilty of simple assault. Judgment was entered upon the verdict. From this, defendant appeals, and assigns many errors for reversal:

First, that there was no corroborating evidence. In this, he relies on Section 5488 of the Code of 1897, which provides that, in a prosecution for assault with intent to commit rape, the defendant cannot be convicted on the testimony of the injured party, unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense.

1. RAPE: opportunity and complaints as corroboration.

It is the contention of the defendant that the charge made was permitted to go to the jury upon uncorroborated testimony of the prosecuting witness, without other evidence tending to connect the defendant with the commission of the offense. At the conclusion of the evidence for the State, the defendant moved that the charge of assault with intent to commit rape be withdrawn from the consideration of the jury, for the want of evidence to support it, and in that there was no evidence in the record, outside of the evidence of the prosecuting witness, Mary Hattery, the injured party, tending to single out or point to the defendant as the one guilty of the crime. This being overruled, the defendant then moved that the court strike from the record all evidence as to what was said by the prosecuting witness, Mary Hattery, to her daughter and others, long after the time when it is claimed the assault was committed, as incompetent, immaterial, and self-serving. These motions were also overruled. This is the first complaint made.

The court, in its instructions to the jury, told them that a conviction cannot be had upon the testimony of the person assaulted, unless she be corroborated by other evidence

tending to connect the defendant with the commission of the offense, and that the corroboration must be found in other testimony than that given by the prosecuting witness; that there must be a showing of facts and circumstances other than shown by her testimony, which tended to connect the defendant with the assault charged against him, and then said that the complaints of the prosecutrix to others are not alone sufficient to constitute the corroboration required by law; that evidence of bruises on her body and evidence of torn clothing are not alone corroboration, for none of them may tend to connect the defendant with the commission of the offense charged; that opportunity is not enough in itself to constitute the corroboration required by law, and finally said there must be independent testimony in the case, outside of the evidence of the prosecutrix, which tends to identify and single out the defendant as the perpetrator of the crime charged, and which, considered in connection with the testimony of the prosecutrix, connects the defendant with the commission of the crime.

The record discloses that the defendant was a farmer and an unmarried man, and lived alone in a home upon his farm; that he engaged the prosecutrix to keep house for him; that he was to furnish a home for her and her daughter, and buy the girl what clothes she needed to go to school, but was not to pay wages; that she was to have the privilege of living in his home and storing whatever goods she had there; that she came to defendant's home about the 1st of March, and brought considerable personal property with her; that she stayed there about 13 days; that, after her coming, she did the housework, prepared the meals, etc. The prosecuting witness is about 52 years of age, and the defendant, about 47.

The State's testimony, as set out in the abstract, is substantially as follows: The prosecuting witness testified:

"Beulah, my daughter, is 14 years of age. We went to

defendant's about the 1st of March. No one lived there but the defendant. After we had been there a week or so, defendant showed us some pictures of former housekeepers and said: 'One of them used to take me down and sit on me. Another one sat on my lap. Another took a bath by the stove, while I sat by the stove, reading a paper.' I was shocked, and said, 'I believe you had only chippy women here.' About a week after this, he came home in the afternoon, from helping the neighbors take hogs to Lacey. My daughter was at school. When he came home, he said something, and grabbed me. Later in the afternoon, I asked him whether he had his dinner. I was getting a meal for him. He came home in the middle of the afternoon. He took me down on the floor. Grabbed my wrapper off. I tried to get away. He tore my wrapper all off,—tore the buttonholes off. I tried to get away. He tore my shirt off. I tried to keep my clothes down. I had on an undershirt that was fastened in the back. My wrapper was buttoned down the front. He tore my shirt down the back, and tore it clear off of me. He could not get my other clothes off. The upper part of my body was naked. I told him my girl would come home pretty soon. He let me go, and said something; said that if I didn't give in, my daughter would. He said he would get it some way. He said that when he took me down. He didn't keep me down long. After he let me go, I ran upstairs and went to my room,—put a chair against the door. When he went out, I went downstairs. I found my shirt on the stove, put on my clothes, and then the girl came home."

She was then asked this question:

"Did you tell the girl anything about what had happened? A. No, not until she wanted to know what was the matter. Q. At the time she came home from school, did you tell her what had happened? A. After she asked me. Defendant came while I was getting supper. He came

in for supper. Q. At the time when the girl first came, did you explain to her what happened? A. I did not. Q. Did you get supper that night? A. Yes, sir. Later, I was going to take a bath. Had a tub and two chairs ready. Was heating water on the stove. He was reading. He was in the dining room; I in the kitchen. He grabbed the water and threw it out. Said I had to obey orders. The girl was there with me. He nearly knocked me down when he threw the tub of water out. Said I must obey orders. We went upstairs, and got ready to go to town. I started to take my wrapper off. My girl noticed my shirt, and wanted to know what was the matter with my shirt. I told her I had burned it. She wanted me to tell her more, but I didn't. Told her no more until we got to Lacey. Before we started for Lacey, he was in bed downstairs. We went to one Martin's. Mr. Hull came over there, and I told them what had taken place. They took us to Lacey. They took us to Moffit's, at Lacey. We stayed there all night. I had a blue mark on my arm. I went back to the defendant's afterwards and got my things. I saw him then, and he swore at me. Said I was a darn liar and a thief. I think Lacey is about a mile from the defendant's place."

On cross-examination, she testified:

"When he let me up, I went upstairs, and he went outdoors and went to sawing wood. When I got dressed, my daughter came. I got supper and set the table. I cooked the supper. I sat down to the supper. Defendant sat down and ate supper. I don't remember whether I ate or not. We had supper about six o'clock. Defendant sawed wood until supper time. I don't know whether he did his chores after supper or not. After supper, I changed my dress to go away. When defendant had me down, I did not scream. I was so weak, and nobody there. I didn't show anybody my bruises down at Martin's. Didn't show my daughter the bruises on my arm until we got to Moffit's."

Charles Martin, to whose house the prosecuting witness first went on the evening of the day when it is claimed the assault was committed, testified:

"She came to my house about the 14th of March. After she had been there a time, she told me, to some extent, what had happened. She didn't tell me at first. I don't remember what she said. She said something about 'this tear-up.' I don't remember what she said. Something about having had a tear-up."

On cross-examination, he said:

"I don't remember what she said. She said something about having had a tear-up. That is as near as I can remember."

The daughter, when on the stand, testified substantially the same as the mother, as to the showing of the pictures, and touching the servant girls he had before, and their conduct, and further said that, when she came home from school, her mother acted scared; that, when she asked her what was the matter, she didn't say anything. She further testified:

"I was by mother at the time he pushed her over [referring to the time when water was being prepared for a bath], and we went upstairs and changed our clothes. We were going to go. She had on a wrapper. It was torn. The buttonholes were torn. She took it off. Her shirt was torn and burned across the back. We were getting ready to leave. We went to a neighbor's. They didn't want to keep us, and took us to Lacey, and we stayed at Moffit's. I noticed blue marks, two scratches, on mother's arm. She said Wilbur [meaning the defendant] had done it."

Hull, the man who came to the Martin's home while the prosecuting witness was there, testified:

"It was about 8:30,—might have been a little later. I came over. Mrs. Hattery and her daughter were at Martin's. The prosecuting witness told me what she had been

through. We arranged to take them to town. Went back to defendant's with Mrs. Hattery and her daughter, and got some furniture and wearing apparel. This was four or five days after she had gone away."

This is all the testimony on the part of the State.

Now, it is apparent that defendant was in his own home; that the prosecuting witness was there by his permission, a servant working in his home. He had opportunity to do the thing charged to have been done by him. He was there, she was there, and they were alone. There is not one scintilla of evidence tending to connect the defendant with the commission of the crime charged, except that which comes from the mouth of the prosecuting witness herself. This is not sufficient, under the law, to make corroboration. The law requiring corroboration was enacted for the purpose of protecting those who might be wrongfully accused without satisfactory evidence of guilt. This statute has a purpose, and it is made in recognition of the fact that people may be falsely accused of this crime, and that charges of this kind are easily made and hard to disprove, and, when made, provoke hostility in the minds of the general public against the party charged. So the law has wisely said that mere opportunity is not sufficient corroboration; that, while the fact that a crime has been committed may be shown by the testimony of the prosecuting witness, other evidence than that which comes from her must be found, tending to connect the party charged with the commission of the crime, before he can be convicted. It is one thing to find that a crime has been committed, and it is quite another thing to say that the party charged committed the crime. When it is sought to attach the guilt of the crime to any individual, the testimony of the prosecuting witness is not sufficient for that purpose. There must be other independent testimony, tending in some way to connect him with the commission of the crime. This

rule has its purpose,—a righteous purpose,—and should not be disregarded, even though, in a particular case, its application may allow a guilty party to escape. As said in *State v. Egbert*, 125 Iowa 443:

"The complaints of the prosecutrix, soon after the commission of the crime, and the condition of her body and clothing, may constitute corroboration of her testimony that a crime has been committed (that is, that someone has committed the crime charged upon her), but they cannot possibly constitute the corroborating evidence required by the statutory provision above referred to. Certainly, the declarations of prosecutrix identifying the defendant as the person who committed the crime can have no greater weight than the testimony of prosecutrix under oath to the same effect."

It is not up to us to say that the testimony of this prosecutrix as to what occurred is most improbable. It is not for us to pass upon the credibility of her testimony. It presents a picture quite out of harmony, however, with the common experience and the observation of men. It is enough for us to say that there was a total absence of corroborating evidence tending to connect the defendant with the commission of the crime. Independent of the statements made by the prosecuting witness and her testimony, there is nothing. She cannot corroborate herself. If she could, the statutory provision would be no protection to one wrongfully accused. The court should have sustained defendant's motion.

We are further of the opinion that the testimony of the prosecutrix, given after she reached Martin's, was wholly incompetent. There was no spontaneity about it. She had time to deliberate and consider the thing best for her to say, and most effectual for her purposes. It certainly was not a part of the *res gestae*. The statements were made

2. RAPE: complaints not constituting *res gestae*.

at such a time and under such circumstances that they do not appear to be the result of excitement, produced by an assault upon her. The general rule is that the declarations of the prosecutrix are admissible only when made soon after the transaction to which they relate, and under such circumstances as indicate that they are spontaneous and unpremeditated. Time is not always a bar to the admission of this testimony; but when it is made to appear that an opportunity for complaint was given, and she made none, and there was nothing to prevent her doing so, the question presents a different aspect. It is not then the cry of distress. It is not then the indignant protest of a virtuous gentlewoman, deeply wronged,—not the wrong itself, crying for redress. When it appears that time for meditation has preceded the declaration, and the declaration bears upon its face the evidence of premeditation, deliberation, and well-weighed speech, it does not savor of that character of complaint which the law admits in cases of this kind. On this point, see *State v. Novak,* 151 Iowa 536.

It will be noted that it is alleged that the crime was committed on the 14th day of March, 1918. On the trial of the case, the defendant called to the defense certain medical gentlemen, Drs. Rogers, Clark, and Barnes. These gentlemen were all skilled in their profession, duly licensed physicians, and admitted to be competent to give expert testimony. Dr. Clark testified that he knew the defendant; that, some time during the month of March, 1918, in connection with Drs. Barnes and Rogers, he made a physical examination of the defendant. The examination was for the purpose of determining whether it was physically possible for him to consummate the act which it was charged in the indictment he intended to commit. He was then asked what was the result of the examination. Objection was interposed and sustained. Defendant's counsel thereupon

3. RAPE: physical incapacity: effect.

stated that the witnesses would testify, and he offered to show by their testimony, that, in the month of March, 1918, within a very short time after it is alleged the offense charged was committed, this doctor, in connection with the other physicians, Clark and Barnes, examined the defendant for the purpose of determining whether it was possible for him to perform the act of sexual intercourse, and that, as the result of the examination, they found that it was impossible for him to perform the act of sexual intercourse; that this was the condition at the time it is alleged the offense was committed, and for more than two years prior to the examination; that the examination was thorough, and made according to all tests used for that purpose. This offer was also objected to, and the objection sustained. These other doctors were called, the same questions propounded, and the same offer made, and refused. This further question was asked:

"From what you learned of the condition of the defendant on the examination, and from his then physical condition, what is your opinion as to whether or not the defendant was capable of performing the sexual act?"    (Objected to and sustained.)

The doctors were further asked:

"Could you determine, from the examination you made what was the cause of his then condition?"    (Objected to and sustained.)    Further question: "I will ask you, if a person receive a severe stroke of paralysis in the year 1914, state whether or not the condition which you found there would be the result of such stroke?"

The defendant further offered to show—and his offer was denied—that, in the month of March, 1914, he suffered from a stroke of paralysis, that wholly incapacitated him on one side, and finally on both sides; that he was unable to swallow, and had to be carried to his home; and that he never fully recovered from that condition. The fact of the

stroke and the consequences that followed the stroke, the defendant offered to show through the mouths of four witnesses; but, in each instance, the court denied him the right to make the showing. We think this was error, and very prejudicial to the rights of the defendant. In *State v. Bartlett*, 127 Iowa 689, this court said:

"As a witness in his own behalf, the defendant testified that, for nearly a year before the alleged assault, he had been unable, by reason of impotency, to engage in the sexual relation. It is now complained of that the court did not in any way refer to such subject-matter in the instructions to the jury. No request was made for an instruction; but, aside from this, we think none was required to be given. While impotency may be a sufficient defense to an indictment for the consummated offense of rape, it will not excuse an assault with intent" to commit rape.

This is relied upon by the State to justify the court's action. Now, it is true that an assault with intent to commit rape may be made by one who is wholly physically incompetent to consummate the act. The fact of incompetency is no defense, but the fact is material and proper to be shown on the question of intent. The burden is on the State, not only to prove the assault, but that it was made with the intent charged; and, if it were made to appear, as the defendant offered to make it appear, that he was wholly incapable of consummating the act, this would have probative force upon the question of the intent in the mind of the defendant in making the assault, if that assault were made. We may illustrate the matter in this way: The defendant, in anger, points a gun at another, and pulls the trigger, knowing that the gun is loaded, and capable of inflicting severe injuries upon the person thus assaulted, if discharged. But the gun, from some cause or other, is not discharged. The intent to inflict injury may be found in the act shown to have been done. Or, if he does not know

that it is loaded, but believes it is, and does the act in the same way, the intent to inflict injury may be gathered from the act. But if he points a gun at another, knowing that it is not loaded, and knowing that injury cannot be inflicted by its use, it cannot be said that he intended to inflict that injury which he knew could not result from the act which he did. The court instructed the jury upon this point as follows:

"The law warrants the presumption or inference that a person intends the results or consequences following an act which he intentionally commits, which do follow such act, if the proof establishes such facts."

A jury might well find, with such evidence before it, that the one charged did not intend to consummate the act which he knew, at the time, he was wholly incapable of consummating. Though the fact, if proven, would not, in itself, be a defense, it was a fact, when proven, that bore strongly upon the intent of the defendant in making the assault charged, and was, therefore, competent evidence to be considered by the jury, when it came to determine the intent with which the assault was made. Moreover, the court permitted the State, on cross-examination of these doctors, after excluding the offer aforesaid, to propound and have answered the following questions:

"Q. You say this man was below normal at the time you examined him? A. We considered him mentally below normal. Q. A man could be below normal, and yet have sexual desire? A. Yes, sir."

The defendant thereupon asked the question: "Could a man in his condition have that desire?" This was objected to as incompetent, irrelevant, and immaterial, and the objection was sustained.

There are other errors assigned; but they will not arise on another trial, if another trial is to be had, and we

do not, therefore, at this time feel called upon to consider them.

For the errors pointed out, the case is—*Reversed.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.